IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF COURT
2015 MAR -9 PM 4: 08
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| | |
|---|---|
| R.G. Barry Corporation,<br>13405 Yarmouth Road, N.W.<br>Pickerington, OH 43147,<br><br>        Plaintiff,<br>v.<br><br>Olivet International, Inc.<br>11015 Hopkins Street<br>Mira Loma, CA 91752<br><br>and<br><br>FTI Corporation Ltd.<br>33 Canton Road, Tower One<br>Floor 21, Room 2107B<br>Tism Sha Tsui, Kowloon<br>Hong Kong SAR,<br><br>        Defendants. | Case No.: 2:15CV0826<br>Judge: Judge Marbley<br><br>Magistrate Judge:<br>MAGISTRATE JUDGE DEAVERS<br><br>JURY DEMAND ENDORSED<br>HEREON |

## COMPLAINT

Plaintiff R.G. Barry Corporation ("R.G. Barry") for its Complaint alleges as follows:

### INTRODUCTION

1. This is an action for breach of contract arising from Defendant Olivet International Inc.'s ("Olivet") multiple breaches of a July 14, 2010 Trademark License Agreement between R.G. Barry and Olivet (as amended November 20, 2013, the "License Agreement"). Olivet failed to pay timely to R.G. Barry its contractually obligated quarterly royalties and marketing support payment of no less than $237,500, among other breaches of the License Agreement. As a result, R.G. Barry validly terminated the License Agreement. Olivet also repudiated its obligations under the License Agreement, thereby depriving R.G. Barry of

B4366406.1

contractually mandatory minimum royalties amounting to $3,400,000, as well as $400,000 in marketing support payments and $100,000 in merchandising fee payments over the remaining contract term. Defendant FTI Corporation Ltd. ("FTI"), Olivet's parent company, is liable on account of its guarantee that it would make "full, prompt and complete payment" of the monies owed by Olivet to R.G. Barry under the License Agreement.

## PARTIES

2. Plaintiff R.G. Barry Corporation ("R.G. Barry") is an Ohio corporation with a business address of 13405 Yarmouth Road, N.W., Pickerington, OH 43147. R. G. Barry is a leading brand developer and additionally markets consumer products in the retail accessories category.

3. Defendant Olivet International, Inc. ("Olivet") is a California corporation, with a principal place of business in Mira Loma, California. Olivet is engaged in the business of apparel manufacturing and the wholesale distribution of the garments it produces.

4. On information and belief, defendant FTI Corporation Ltd. ("FTI") is a Hong Kong corporation, with a principal place of business in Hong Kong. FTI is Olivet's parent company. FTI signed a guaranty, whereby it agreed to promptly pay the full and complete amount owed by Olivet under the License Agreement if Olivet failed to make a payment when due (the "Guaranty"). See License Agreement, p. 32.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this action pursuant to the provisions of Title 28 U.S.C. §§ 1332. The parties hereto are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

2

B4366406.1

6. Defendants have consented to personal jurisdiction over them in Ohio through the License Agreement. License Agreement, § 10.17, p. 32. In addition, this Court has personal jurisdiction over both Defendants because this dispute arises out of and/or relates to both Defendants' minimum contacts with this forum, namely, their approaching and contracting with R. G. Barry in Ohio.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that "a substantial part of the events or omissions giving rise to the claim[s] occurred" within this district, and in that "a substantial part of property that is the subject of the action is situated" in this district. 28 U.S.C. § 1391(b)(2). In addition, the License Agreement includes forum selection provisions by which Olivet and FTI have each subjected themselves to the jurisdiction of this Court for disputes arising out of either the License Agreement or the Guarantee, respectively.

## ALLEGATIONS COMMON TO ALL COUNTS

8. R.G. Barry is a multi-dimensional, growing provider of functional, fashionable accessory products including slippers, handbags, tote bags, travel accessories and shoe cushions. R.G. Barry was founded in Columbus, Ohio in 1947, and in 1948 introduced the world's first foam-cushioned, washable slipper.

9. In 1958, R.G. Barry began using the trademark DEARFOAMS® in connection with its slippers, and in 1960 it obtained U.S. Registration No. 0,707,816 for the mark DEARFOAMS. The trademark was originally used to market slippers in department stores. Over the next half-century, R.G. Barry expanded its distribution of DEARFOAMS slippers into numerous additional trade channels, including mass merchants/discount stores, specialty/independent/footwear retailers, warehouse clubs, off-price/discount stores, and online

e-commerce sites. Retailers of DEARFOAMS-branded products currently include JCPenney, Sears, Famous Footwear, DSW, Costco, Kohl's, T.J. Maxx, Burlington Coat Factory, Big Lots and Zappos.com and other smaller regional department stores. Since the inception of the brand, R.G. Barry has sold more than a billion pairs of DEARFOAMS slippers.

### A. The License Agreement

10. In or about the spring of 2010, following a successful new marketing campaign by R.G. Barry, Olivet approached R.G. Barry and expressed interest in licensing the DEARFOAMS mark for use in a new sleepwear line.

11. Olivet touted its experience in sales of licensed brands, including sleepwear, knits and ready-to-wear, and its relationships with numerous retail partners, to promote its ability to successfully launch and grow a sleepwear line employing the DEARFOAMS mark.

12. After discussions, on or about July 14, 2010, R.G. Barry and Olivet entered into a Trademark License Agreement. A true copy of the License Agreement, with all amendments, is attached hereto as Exhibit 1.

13. Under the License Agreement, R.G. Barry granted Olivet an exclusive license to use certain DEARFOAMS-formative trademarks for certain specified products, including sleepwear, apparel and outerwear/accessories. The License Agreement covered the trademarks DEARFOAMS, DEARFOAMS SPECIAL EDITION, DF BY DEARFOAMS, UTOPIA BY DEARFOAMS, and DF SPORT BY DEARFOAMS (collectively, the "Licensed DEARFOAMS Marks"). Pursuant to the License Agreement, Olivet was to sell the specified products bearing the Licensed DEARFOAMS Marks at wholesale through approved trade channels (categories of merchants) to approved accounts (specifically identified retail stores and distributors). License Agreement, Schedule A.

14. The License Agreement required Olivet to make reasonable commercial efforts to exploit the Licensed DEARFOAMS Marks throughout the Territory, including by selling a sufficiently representative quantity of all styles, fabrications, colors and sizes of the products bearing those marks ("Licensed Products"); offering for sale the Licensed Products so that they might be sold to consumers on a timely basis; and maintaining a sales force sufficient to provide effective distribution throughout all areas of the contractually defined territory. License Agreement, § 1.9. Olivet was also required to "diligently, continuously, and aggressively promote the sale and distribution of the Licensed Products." Id., § 1.15.

15. The Initial Term of the License Agreement originally ran from July 1, 2010 through December 31, 2015. License Agreement, § 7.1. The License Agreement also provided for an optional Renewal Term, to run from January 1, 2016 through December 31, 2020. Id., § 7.2. The License Agreement would terminate after the Initial Term if Olivet and R.G. Barry could not agree upon the terms and conditions of a Renewal Term. Id.

16. Under the License Agreement, Olivet was obligated to make "Minimum Sales" of Licensed Products in each License Year. License Agreement, § 2.2. In addition, Olivet was required to pay to R.G. Barry "Minimum Guaranteed Royalties" in each year of the License Agreement. Id., § 3.4. For the Initial Term, the aggregate Minimum Guaranteed Royalties were $5.1 million. Id.

17. R.G. Barry had the right to terminate the License Agreement before the Initial Term had expired, without cause and in its sole discretion, upon ninety days' prior written notice to Olivet. License Agreement, § 7.1. R.G. Barry also had the right at any time to terminate the agreement immediately for a number of specified material breaches by Olivet: if Olivet ceased

B4366406.1

doing business or took steps to do so; or if Olivet failed to use the Licensed Marks for a period of six months. Id., §7.4.

18. In addition, in the event that Olivet failed to perform or observe any term, covenant, or agreement contained in the License Agreement, R.G. Barry had the right to terminate upon notice to Olivet, unless Olivet cured such breach within thirty days of the notice. License Agreement, § 7.5. If the notice of termination related to non-payment of royalties or inferior product quality, pending cure Olivet was not permitted to ship Licensed Products. Id. If Olivet shipped Licensed Products despite this prohibition, it would forfeit its right to cure. Id.

19. The License Agreement did not grant Olivet the right to terminate the Agreement during the Initial or the Renewal Terms.

20. The License Agreement is governed by Ohio law. License Agreement, § 10.16. The License Agreement also includes a forum selection clause which requires the parties to bring any legal action or proceeding with respect to the agreement in state or federal court located in Columbus, Ohio. The parties expressly consented to the personal jurisdiction of Ohio courts for all such proceedings. Id., § 10.17.

21. Defendant FTI irrevocably guaranteed "the full, prompt, and complete payment when due" of Olivet's royalty obligations under the License Agreement. FTI agreed to promptly pay such amounts as and when due. FTI also agreed to be subject to the exclusive jurisdiction of the courts of the State of Ohio or of the United States of America located in Franklin County, in the City of Columbus for any action arising under the License Agreement. See License Agreement at 32.

### B.     The License Amendment

22.     As part of its pitch to R.G. Barry, Olivet proposed the Minimum Sales Obligations and Minimum Guaranteed Royalties amounts. During the first year and a half of the Initial Term (July 1, 2010 through December 31, 2011), Olivet was required to sell at least $5,000,000 in Licensed Products and pay at least $475,000 in royalties. By year three (calendar year 2013), Olivet was required to sell at least $12,000,000 in Licensed Products and pay R.G. Barry at least $1,020,000 in royalties.

23.     By mid-way through 2013, it was apparent that Olivet would not be able to meet 2013's Minimum Sales Obligations for 2013. In or around the fall of 2013, Olivet approached R.G. Barry, and offered to extend the term of the License Agreement by three years (thereby setting a new Renewal Term) immediately in exchange for R.G. Barry's agreement to reduce the License Agreement's Minimum Sales Obligations, and the corresponding Minimum Guaranteed Royalties, for the entire Renewal Term.

24.     Olivet represented to R.G. Barry that it would be capable of fulfilling its proposed revised requirements and that it anticipated doing so.

25.     R.G. Barry accepted Olivet's offer to amend the License Agreement relying on Olivet's representations that it believed it could meet the new Minimum Sales Obligations. On or about November 20, 2013, the parties executed Amendment No. 1 to Trademark License Agreement (the "Amendment"). The Amendment extended the term of the License Agreement for five years, to 2018, while substantially reducing Olivet's annual Minimum Sales and Minimum Guaranteed Royalties for each of the term years. A true copy of the Amendment is included in Exhibit 1 to this Complaint.

26. The Amendment changed the structure of the Minimum Sales Obligations in the original License Agreement. Under the original License Agreement, Olivet's Minimum Sales Obligation increases in each contract year. Under the Amendment, Olivet's Minimum Sales Obligation was kept at $10,000,000 for each year in the Renewal Term. Amendment, § 1.b.

27. On information and belief, Olivet had no intention of carrying out its contractual obligations for the entirety of the Amendment's Renewal Term. Olivet approached R.G. Barry and suggested amending the License Agreement for the express purpose of reducing its obligations under the License Agreement in anticipation of trying to terminate that agreement. At the time that Olivet entered into the Amendment, it knew that it was incapable of meeting the Minimum Sales Obligations.

28. By inducing R.G. Barry to enter into the Amendment, Olivet reduced significantly its Minimum Guaranteed Royalty obligation. Under the original License Agreement, Olivet was obligated to pay R.G. Barry royalties of at least $2,975,000 for the remaining two years in the Initial Term. If it had opted into a Renewal Term under the original License Agreement, Olivet would have been obligated to pay R.G. Barry royalties on significantly higher Minimum Sales than under the Amendment. For example, Olivet would have been required to make Minimum Sales of $22,000,000 in 2016, $24,000,000 in 2017, and $26,000,000 in 2018 (and make not-yet-determined royalty payments accordingly). Under the Amendment, Olivet only needed to make Minimum Sales of $10,000,000 in each of those years. Therefore, its royalty obligations for the five-year Renewal Term under the Amendment, which were linked to that amount, were lower than they would have been under the original License Agreement.

B4366406.1

### C. Olivet's Minimum Guaranteed Royalty Obligations Under the License Agreement

29. The License Agreement and the Amendment guaranteed R.G. Barry minimum royalties to be paid by Olivet. In addition to the Guaranteed Minimum Royalties, Olivet was required to pay Percentage Royalties based on sales above the Minimum Sales. See License Agreement, § 3.2.

30. Pursuant to the Amendment, Olivet was obligated to pay R.G. Barry Minimum Guaranteed Royalties for 2014 through 2018 of $850,000.00 per annum. Amendment, § 3.b.

31. Under the License Agreement, Olivet was obligated to pay royalties in four equal installments each License Year, to be paid on January 31, April 30, July 31, and October 31 for the calendar quarter ended the prior month. License Agreement, § 3.4. Late royalties accrued interest at the lower of 1% per month and the highest rate permitted by Ohio state law. Id., § 3.9.

32. At the time each quarterly royalty payment was due, Olivet was also obligated to deliver to R.G. Barry a royalty statement, in a form specified by the License Agreement (the "Royalty Statement"). The Royalty Statement was to be certified by Olivet's Chief Financial Officer and was to set forth all information relevant to the then-due royalty payments, including gross sales of Licensed Products; the amount of returns, allowances and discounts from gross sales that properly could be deducted; net sales of Licensed Products; and gross Sales and net Sales by account. License Agreement, § 3.5.

33. The License Agreement explicitly provided that Olivet's obligation to pay royalties under the agreement was "absolute" and that Olivet had no right to set-off, compensate or make any deduction from such royalty payments for any reason whatsoever. License Agreement, § 3.10.

### D. Olivet Abandons Its Obligations

34. On or about June 17, 2014, less than seven months after the Amendment was signed, Peter Lin, Olivet's Corporate Secretary, wrote to R.G. Barry requesting that the License Agreement be terminated, and indicating that it "could no longer sustain [the DEARFOAMS] business." In his letter Mr. Lin incorrectly asserted that the License Agreement only obligated Olivet to pay one year of royalties, and offered to pay six months of royalties, through the end of 2014. A true and accurate copy of this letter is attached hereto as Exhibit 2.

35. On or about July 3, 2014, R.G. Barry's Senior Vice President - Finance, Jose Ibarra, wrote to Mr. Lin, reminding him of the concessions made by R.G. Barry in the Amendment, noting that Olivet had no unilateral right to terminate the License Agreement, and stating that R.G. Barry would not agree to terminate the License Agreement. Mr. Ibarra further stated that R.G. Barry expected Olivet to live up to its obligations under the License Agreement. A true and accurate copy of this letter is attached hereto as Exhibit 3.

36. Olivet did not respond to Mr. Ibarra's July 3, 2014 letter for nearly four months. Although Olivet made the July 2014 quarterly royalty payment as it was due, it provided no assurances that it would continue to uphold its obligations under the amended License Agreement.

37. Notwithstanding Mr. Ibarra's letter, on information and belief, Olivet took steps toward the cessation of its apparel business beginning in the summer of 2014, including by laying off employees who worked in Olivet's apparel division.

38. Shortly after Mr. Ibarra wrote to Olivet, in or around the summer of 2014, multiple existing R.G. Barry DEARFOAMS slippers customers approached the company and expressed that they were concerned that they would be unable to obtain DEARFOAMS

sleepwear for 2015 sales, because they had heard that Olivet was closing its business and no longer licensing the Licensed DEARFOAMS Marks. In addition, during this time, R.G. Barry was approached by certain companies that had recently hired individuals who had previously worked for Olivet and had been laid off as part of Olivet's shutting down its sleepwear business. These companies expressed interest in licensing the Licensed DEARFOAMS Marks for use with sleepwear, and indicated that they had learned that Olivet was abandoning the DEARFOAMS sleepwear market, had shut that division of its company, and had laid off employees. In addition, R.G. Barry was also informed that there was not very much DEARFOAMS sleepwear on the market for fall 2014, and that some retail partners could not secure delivery of DEARFOAMS sleepwear for 2015.

39. R.G. Barry did not initiate discussions with any potential licensee, and did not enter into any agreements, formal or informal, to license the DEARFOAMS Marks to anyone other than Olivet. Rather, R.G. Barry continued to seek to hold Olivet to the terms of its contractual obligations.

40. On or about October 21, 2014, Mr. Lin once again wrote to R.G. Barry and requested that the License Agreement be terminated. In his letter, Mr. Lin alleged that R.G. Barry had breached the License Agreement's exclusivity provisions by purportedly seeking new licensees for the apparel/sleepwear line. R.G. Barry had done nothing of the sort.

### E. Olivet Breaches Its Payment Obligations

41. Under the License Agreement, Olivet owed an advance Guaranteed Minimum Royalty payment of $212,500 for the fourth quarter of 2014, as well as a quarterly Advertising Obligation payment in the amount of $25,000, on October 31, 2014. License Agreement, §§ 3.4;

4.1. Olivet did not make either the Guaranteed Minimum Royalty payment or the Advertising Obligation payment on October 31, 2014.

42. Under the License Agreement, Olivet was obligated to provide R.G. Barry with a Royalty Statement on October 31, 2014. License Agreement, § 3.5. Olivet did not provide the Royalty Statement required by the License Agreement on October 31, 2014.

43. On November 7, 2014, Olivet's Mr. Lin wrote again to R.G. Barry's Mr. Ibarra. Mr. Lin reiterated his unfounded accusations that R.G. Barry had breached the exclusivity provisions of the License Agreement by "engag[ing] third parties in licensing talks." Mr. Lin also stated that Olivet had "put on hold the royalty payment that was otherwise due October 31, 2014."

44. On November 20, 2014, via letter from Jose Ibarra to Olivet's Chief Operating Officer, David Yu, and Corporate Secretary, Mr. Lin, and copying FTI's Chief Executive Officer, Jerry Moon, R.G. Barry gave Olivet and FTI notice under Section 7.5 of the License Agreement that Olivet was in breach of its obligations under the License Agreement to pay royalties and provide the quarterly Royalty Statement on October 31, 2014 (the "Breach Notice"). R.G. Barry gave further notice that should Olivet fail to cure these breaches within thirty days it would terminate the License Agreement.

45. In the Breach Notice, R.G. Barry also responded to Olivet's assertion in its earlier letter that R.G. Barry had engaged third parties in licensing negotiations. R.G. Barry denied having done so, pointing out that Olivet had decided to exit the apparel business and was winding down its operations. R.G. Barry explained that all preliminary expressions of interest it had received relating to the Licensed DEARFOAMS Marks were unsolicited, occurred after

B4366406.1

Olivet had indicated that it would close down its apparel business, and came about due to the knowledge in the trade of Olivet's termination of employees and shutdown of the business.

46. Pursuant to Section 7.5 of the License Agreement, Olivet had 30 days from the Breach Notice to cure its breaches, which was December 22, 2014. Olivet did not pay by December 22, 2014 the royalties or advertising payments due on October 31, 2014. Olivet did not provide by December 22, 2014 the Royalty Statement due on October 31, 2014. As a result, R.G. Barry's notice of termination became effective automatically as of December 22, 2014.

47. By letter dated December 23, 2014, R.G. Barry confirmed the termination of the License Agreement, due to Olivet's failure to cure its breach of nonpayment.

48. As of the date hereof, there are Minimum Royalty Payments of at least $3,400,000 that would become due under the License Agreement under the remaining term of the agreement.

49. In addition, Olivet was obligated to pay to R.G. Barry $100,000 per contract year for advertising, promoting and marketing the Licensed Trademarks ("the Advertising Obligation"), and $25,000 per year for R.G. Barry's proprietary, confidential research information concerning brand strategy, product design and merchandise planning ("the Merchandising Fee"). As of the date hereof, there are Advertising Obligation Payments of at least $400,000 and Merchandising Fee payments of at least $100,000 that would be due under the License Agreement under the remaining term of the agreement.

50. On January 16, 2015, nearly one month after R.G. Barry confirmed termination of the License Agreement, Olivet sent R.G. Barry a check which purported to cover payment for "royalty and advertising obligation payments" through December 23, 2014. The check was for $237,500 -- the amount that would have been due on October 31, 2014.

13

B4366406.1

51.     The January 16 check was sent to R.G. Barry more than two months after the third-quarter payment was due, and three weeks after the time period which Olivet was given to cure. Therefore, it was not a legitimate payment under the License Agreement.

## Count I
(Breach of Contract Against Olivet)

52.     R. G. Barry hereby re-alleges and incorporates by reference the allegations of Paragraphs 1 through 51 as if fully set forth herein.

53.     Olivet has breached the License Agreement. Olivet's breaches include the following:

    a.      Failing to pay the Guaranteed Minimum Royalties on October 31, 2014 pursuant to Section 3.4;

    b.      Failing to provide the quarterly royalty statement that was due on October 31, 2014 pursuant to Section 3.5;

    c.      Failing to satisfy its required Minimum Sales pursuant to Section 2.2;

    d.      Failing to provide the quarterly Advertising Obligation payment on October 31, 2014 pursuant to Section 4.1;

    e.      Failing to "use all commercially reasonable efforts to exploit the Licensed Trademarks throughout the Territory" and failing to "diligently, continuously, and aggressively promote the sale and distribution of the Licensed Products" and to "maintain adequate arrangements for the distribution of the Licensed Products."

    f.      Taking steps toward the cessation of its business; and

    g.      Purporting to set off the Guaranteed Minimum Royalties based on fabricated allegations of breach, in violation of Section 3.10

B4366406.1

54. Olivet failed to cure its breaches after receiving R.G. Barry's Notice of Termination citing breaches of Sections 3.4 and 3.5 of the License Agreement.

55. R.G. Barry has suffered damages as a result of Olivet's breach of the License Agreement, in an amount no less than $4,137,500 plus contractual interest of 12% per annum.

## Count II
(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Olivet)

56. R.G. Barry hereby re-alleges and incorporates by reference the allegations of Paragraphs 1 through 55 as if fully set forth herein.

57. Pursuant to Ohio law, the License Agreement contained an implied covenant of good faith and fair dealing.

58. Olivet's actions, including by moving towards the cessation of its business and communicating about such cessation to third parties, and by failing to exercise reasonable commercial effort to exploit R.G. Barry's trademarks, breached the implied covenant of good faith and fair dealing.

59. As a result of Olivet's breach, R.G. Barry suffered damages, including without limitation the diminution of value of its trademarks, a loss of market presence, and harm to business relationships with potential licensees, plus contractual damages of $4,137,500, plus contractual interest of 12% per annum.

## Count III
(Intentional Misrepresentation/Fraud Against Olivet)

60. R.G. Barry hereby re-alleges and incorporates by reference the allegations of Paragraphs 1 through 59 as if fully set forth herein.

15

B4366406.1

61. While negotiating the Amendment, Olivet represented to R.G. Barry that it would be able to satisfy the Minimum Sales Obligations set forth in the Amendment, and that it anticipated doing so.

62. This representation was material to R.G. Barry's decision to enter into the Amendment.

63. On information and belief, Olivet had no intention of carrying out its contractual obligations for the entirety of the Amendment's Renewal Term, and it knew that it was incapable of meeting the Minimum Sales Obligations.

64. Olivet represented that it was capable of and intending to meet the Minimum Sales Obligations of the Amendment with the intent of R.G. Barry relying on that representation and agreeing to the Amendment, which significantly reduced Olivet's Minimum Sales Obligations and Minimum Guaranteed Royalties.

65. R.G. Barry justifiably relied on Olivet's representation and this reliance caused damages to R.G. Barry in an amount to be determined at trial, including the amount by which Minimum Guaranteed Royalties owed by Olivet to R.G. Barry were reduced.

## Count V
(Breach of Guaranty Against FTI)

66. R.G. Barry hereby re-alleges and incorporates by reference the allegations of Paragraphs 1 through 65 as if fully set forth herein.

67. In conjunction with the License Agreement, Defendant FTI irrevocably guaranteed to R.G. Barry the full, prompt and complete payment when due of payment obligations of Olivet, and agreed to promptly pay such amounts as and when due in the event that Olivet failed to make such payments.

68. Olivet failed to make a Minimum Guaranteed Royalty payment on October 31, 2014.

69. R.G. Barry provided notice of Olivet's non-payment to FTI on November 20, 2014.

70. FTI has breached its guaranty to R.G. Barry by failing to make any payment.

71. As a result of this breach, R.G. Barry has suffered damages in the amount of at least $4,137,500 plus contractual interest of 12% per annum.

**WHEREFORE**, R.G. Barry prays for a judgment:

A. Directing Olivet to:

   (i) make all royalty payments due and owing for the remaining Term of the License Agreement;

   (ii) account for and pay over to R.G. Barry all profits that Olivet has derived from its acts complained of herein, together with prejudgment interest;

   (iii) pay to R.G. Barry all the damages it has suffered as a result of the Olivet's acts complained of herein, including an assessment of trebled actual damages, together with prejudgment interest;

   (iv) pay to R.G. Barry its attorneys' fees and costs in this action; and

   (v) file with this Court and serve on counsel for R.G. Barry within 30 days after entry of an injunction issued by this Court, a sworn written statement as provided in 15 U.S.C. § 1116.

B. Award R.G. Barry such further relief as this Court deems just and equitable.

B4366406.1

Respectfully submitted,

/s/ Joseph R. Miller
Joseph R. Miller, Trial Attorney (0068463)
John M. Kuhl (0080966)
Angelyne E. Lisinski (0089699)
VORYS SATER SEYMOUR & PEASE LLP
52 East Gay Street
Columbus, OH 43215
T: (614) 464-6233
F: (614) 719-4630
jrmiller@vorys.com
jmkuhl@vorys.com
aelisinski@vorys.com


Kenneth S. Leonetti (pro hac vice application pending)
ksl@foleyhoag.com
Kristyn Bunce (pro hac vice application pending)
kbunce@foleyhoag.com
Foley Hoag LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Telephone: 617 832 1000
Facsimile: 617 832 7000

*Attorneys for Plaintiff*

## DEMAND FOR A JURY TRIAL

R.G. Barry demands a jury trial on all issues so triable.

/s/ Joseph R. Miller
Joseph R. Miller, Trial Attorney (0068463)

B4366406.1
3/09/2015 21339713