**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **R.G. BARRY CORPORATION,** : | |
| : | Case No. 2:15-CV-00826 |
| **Plaintiff,** : | |
| : | JUDGE ALGENON L. MARBLEY |
| v. : | |
| : | Magistrate Judge Deavers |
| **OLIVET INTERNATIONAL, INC.,** : | |
| : | |
| **and** : | |
| : | |
| **FTI CORPORATION LTD.,** : | |
| : | |
| **Defendants.** : | |

## OPINION & ORDER

This matter is before the Court on Defendants Olivet International. Inc. ("Olivet") and FTI Corporation Ltd.'s (collectively, "Defendants") Motion to Dismiss Plaintiff R.G. Barry Corporation's ("R.G. Barry") complaint for breach of contract, breach of the covenant of good faith and fair dealing, intentional misrepresentation, and breach of guaranty. (Doc. 9.) For the reasons that follow, the Motion is **GRANTED in part** and **DENIED in part**.

### I. BACKGROUND

*A. The Trademark License Agreement and Amendment*

This case arises from a dispute over a Trademark License Agreement ("Agreement") between R.G. Barry and Olivet. R.G. Barry is an Ohio corporation that develops retail accessory products, including DEARFOAMS slippers, the world's first foam-cushioned, washable slipper. (Compl., Doc. 1 at ¶¶ 2, 8-9.) R.G. Barry has sold more than a billion pairs of DEARFOAMS slippers since the brand was trademarked in 1960. (*Id.* at ¶ 9.)

1

Olivet, a California corporation with experience selling licensed brands to retailers, approached R.G. Barry in the spring of 2010 to propose licensing the DEARFOAMS trademark for use in a new sleepwear line.  (*Id.* at ¶¶ 3, 10.)  On or about July 14, 2010, the two companies signed an Agreement granting Olivet an exclusive license to use certain DEARFOAMS trademarks for certain specified products, including sleepwear, outerwear, and accessories.  (*Id.* at ¶¶ 12-13.)  Olivet was to sell these products bearing the licensed DEAMFOAMS mark to approved retail stores and distributors through approved categories of merchants.  (*Id.*)

Defendant FTI Corporation, Ltd. ("FTI"), a Hong Kong corporation, is the parent company of Olivet.  (*Id.* at ¶ 4.)  FTI signed a guaranty, whereby it agreed to pay the full amount owed by Olivet under the Agreement if Olivet failed to make a required payment.  (*Id.* at ¶ 21.)

The Agreement required Olivet to make certain minimum sales of licensed products in each year of the agreement.  (Trademark License Agreement, Doc. 4 at § 2.2.)  Olivet was also required to pay R.G. Barry minimum guaranteed royalties in each year of the Agreement.  (*Id.* at § 3.4.)  The Initial Term of the Agreement ran from July 1, 2010 until December 31, 2015.  (*Id.* at § 7.1.)  For the initial term, the aggregate minimum guaranteed royalties were $5.1 million.  (*Id.* at § 3.4.)  Royalties were to be paid in four equal installments for each License Year, on January 31, April 30, July 31, and October 31.  (*Id.*)

R.G. Barry had the right to terminate the Agreement before the Initial Term had expired, without condition, upon 90 days prior written notice to Olivet.  (*Id.* at § 7.1.)  The Agreement also permitted R.G. Barry to renew the agreement for an additional five years ("Renewal Term"), subject to the approval of Olivet.  (*Id.* at § 7.2)

R.G. Barry had right to terminate the agreement under Section 7.4 for a number of specified material breaches by Olivet.  (*Id.* at § 7.4(a)-(t).)  R.G. Barry also had the right to

2

terminate under Section 7.5 "[i]n the event of the failure by [Olivet] to perform or observe any term or covenant or agreement contained in this Agreement, other than those specified in Section 7.4," provided that it give notice of the termination to Olivet. (*Id.* at § 7.5.) The termination would become effective automatically unless Olivet "completely cures the breach within thirty (30) days of the giving of the Notice of Termination." (*Id.*)

Section 7.6 of the Agreement provides for a Disposal Period of 120 days after the termination of the Agreement. (*Id.* at § 7.6.) Upon "the expiration or termination of the agreement for any reason whatsoever," this section requires that "all royalties on sales theretofore made shall become immediately due and payable." (*Id.*) Further, such disposition of Licensed Products during the Disposal Period "shall continue to be subject to [Olivet's] obligations hereunder, including, but not limited to, payments to be made to [R.G. Barry] and royalties with respect thereto shall be due on the last day of the Disposal Period." (*Id.*)

Section 7.7 of the Agreement guarantees R.G. Barry's right to receive, at its option, liquidated damages "equal to the total of the Guaranteed Minimum Royalties that would have been payable by [Olivet] to [R.G. Barry] for the twelve (12) months following such termination had the Agreement remained in effect." (*Id.* at § 7.7.)

Additionally, Section 7.3 provides that "termination of the License or other rights granted to the [Olivet] hereunder by [R.G. Barry] on any ground shall be without prejudice to any other rights or remedies which Licensor may have." (*Id.* at § 7.3.)

The Agreement is governed by Ohio law and contains a forum selection clause requiring any legal action with respect to the Agreement to be brought in state or federal court in Ohio. (*Id.* at § 10.16.)

In the fall of 2013, Olivet approached R.G. Barry and offered to extend the term of the Agreement by three years (constituting a Renewal Term) in exchange for R.G. Barry's consent to reduce the Agreement's minimum sales obligations and minimum guaranteed royalties for the entire Renewal Term. (Compl., Doc. 1 at ¶ 23.) R.G. Barry accepted this offer and the parties executed an Amendment to the Agreement on November 20, 2013. (*Id.* at ¶ 25.)

### B. Termination of the Agreement

On June 17, 2014, Peter Lin, Olivet's Corporate Secretary, wrote to R.G. Barry requesting that the Agreement be terminated because Olivet planned to "exit the apparel business in response to severe market conditions." (June 17, 2014 Letter, Doc. 1-2 at 1.) Lin stated that Olivet "could no longer sustain [the DEARFOAMS] business." (*Id.* at 2.) R.G. Barry's Senior Vice President Jose Ibarra responded to Lin's letter and stated that R.G. Barry would not agree to terminate the License Agreement. (July 3, 2014 Letter, Doc. 1-3.) Olivet subsequently made the July 2014 quarterly royalty payment. (Compl., Doc. 1 at ¶ 36.)

In the summer of 2014, R.G. Barry heard from existing DEARFOAMS slippers customers that they were concerned that they would not be able to obtain DEARFORMS sleepwear for 2015 because they had heard that Olivet was closing its business. (*Id.* at ¶ 38.) R.G. Barry maintains that it did not initiate discussions with any potential new licensees or enter into any agreements to license DEARFOAMS to anyone other than Olivet during this period. (*Id.* at ¶ 39.) On October 21, 2014, Lin wrote to R.G. Barry to request termination of the Agreement again, and also alleged that R.G. Barry had breached the Agreement's exclusivity provisions by seeking new licensees. (*Id.* at ¶¶ 39-40.)

On October 31, 2014, Olivet did not pay the quarterly royalty payment of $212,500 or the quarterly advertising payment of $25,000 that were due that day. (*Id.* at ¶ 41.) On November

4

20, 2014, R.G. Barry notified Olivet and FTI that it was in breach of the Agreement and that R.G. Barry would terminate the Agreement under Section 7.5 if Olivet failed to cure its breach within 30 days.  (*Id.* at ¶ 44.)  Olivet did not make the payments and, therefore, on December 22, 2014, 30 days after R.G. Barry's breach notice, the termination of the agreement became effective, which R.G. Barry also confirmed by letter on December 23, 2014.  (*Id.* at ¶¶ 46-47.)

On January 16, 2015, Olivet sent a check to R.G. Barry for $237,500, the amount of royalty payments and advertising payments that would have been due on October 31, 2014.  (*Id.* at ¶ 50.)

### C.  *Procedural History*

Plaintiff filed a complaint alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional representation against Olivet, and breach of guaranty against FTI.  (*Id.* at ¶¶ 52-71.)  Defendants filed a motion to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  The motion is fully briefed and ripe for review.

## II.  STANDARD OF REVIEW

The Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations."  *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005).  Thus, the Court must construe the complaint in the light most favorable to the non-moving party.  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).  The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Generally, a complaint must

contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The allegations need not be detailed but must "give the defendant fair notice of what the claim is, and the grounds upon which it rests." *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  In short, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  It must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

In addition, Federal Rule of Civil Procedure 9(b) requires that "in any complaint averring fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (quoting Fed. R. Civ. P. 9(b)).  The requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).  The Sixth Circuit has explained that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal citations omitted).  Plaintiffs may plead fraud based "upon information and belief," but the complaint "must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations*." Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006) (internal quotation marks omitted).

A complaint's failure to comply with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6). *United States ex rel. Howard v. Lockheed Martin Corp.*, 499 F. Supp. 2d 972, 976 (S.D. Ohio 2007).

### III. ANALYSIS

#### A. Breach of Contract

The Agreement provides that Ohio law applies to its construction. (Trademark License Agreement, Doc. 4 at § 10.16.) To establish a claim for breach of contract under Ohio law, a plaintiff must show that: "(1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). Generally, "contracts should be construed so as to give effect to the intention of the parties." *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989). The parties' intent is "presumed to reside in the language they chose to employ in the agreement." *Anzalaco*, 970 N.E.2d at 1148 (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, 413 (Ohio 1987)). A contract "is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004). The Court "must give effect to each provision of the contract" if to do is reasonable. *Id.* When the contract "specifically provides for a resolution in the event that contract conditions are not met, the court must defer to the parties' agreement." *Younglove Constr., LLC v. PSD Dev., LLC*, No. 3:08-CV-1447, 2010 WL 4570194, at *6 (N.D. Ohio Nov. 3, 2010).

#### 1. R.G. Barry Terminated, not Rescinded, the Agreement

Both parties agree that R.G. Barry terminated the License Agreement under Section 7.5, which allows R.G. Barry to terminate the Agreement, subject to notice and Olivet's right to cure

7

within 30 days, in the event of Olivet's failure to perform or observe any term in the Agreement other than those specified in Section 7.4.  Both parties also agree that R.G. Barry's termination under Section 7.5 triggered the application of Section 7.6, which provides that upon the termination of the Agreement "for any reason," all of the rights of Olivet immediately terminate and revert to R.G. Barry and "all royalties on sales theretofore made shall become immediately due and payable."  (Doc. 4 at §7.6.)  Olivet contends that under Ohio law, a non-breaching party may rescind a contract or sue for breach of contract, but not both.  (Doc. 9 at 8.)  Olivet maintains that by terminating the Agreement under Section 7.5, R.G. Barry effectively rescinded the Agreement and is thus entitled *only* to the remedies specified in Section 7.6, that is, reversion of the license and royalty payments on sales already made.  R.G. Barry counters that under Ohio law:  (1) rescission is a separate remedy from termination; (2) R.G. Barry terminated, not rescinded, the contract; and (3) a party that terminates a contract for breach is entitled to standard damages for that breach even if the agreement does not specifically provide for such damages.  Plaintiff further argues that the Agreement did not limit its rights to seek damages after a termination.

It is a basic principle of contract law that "when a material breach occurs, the nonbreaching party may, at his option, elect to rescind the contract, or continue it in force and sue for damages for the breach."  *Meyer v. Chieffo*, 950 N.E.2d 1027, 1038 (Ohio Ct. App. 2011) (internal quotation marks omitted).  It is "inconsistent to allow the [nonbreaching] party to rescind the contract and yet, at the same time, receive the benefits of the contract." *Sabbatis v. Burkey*, 853 N.E.2d 329, 332 (Ohio Ct. App. 2006).  As such, courts have generally precluded parties from pursuing remedies for both breach of contract and rescission.  *See, e.g.*, *Wilson v. Kruesch*, 675 N.E.2d 571, 576 (Ohio Ct. App. 1996).  Therefore, if by electing to terminate

8

under Section 7.5, R.G. Barry has indeed rescinded the Agreement, then it would not be entitled to sue for damages for breach of contract.

Plaintiff is correct that rescission and termination usually have distinct meanings, and that here it terminated, not rescinded, the License Agreement.  *See Bell v. Turner*, 944 N.E.2d 1179, 1183 (Ohio Ct. App. 2010) ("[R]escission is not merely a termination of the contract; it is an annulment of the contract.  The primary purpose of 'rescission' is to restore the parties to their original positions as if the contract had never been formed.").  Courts have sometimes, however, used "termination" and "rescission" interchangeably.  *See, e.g.*, *Rorig v. Thiemann*, No. 1:05-CV-801, 2007 WL 2071909, at *9 (S.D. Ohio July 17, 2007) (quoting *Wilson*, 675 N.E.2d at 576) ("Where there has been a breach of a material and vital provision of a contract by one party, the other party thereto may either treat the contract as terminated and rescind it and pursue the remedy that such rescission entitles him to, or he may sue for damages for a breach of the contract.").  In cases where a contract refers to both rescission and termination, courts have generally found that the terms had different meanings.  *See Rosepark Props., Ltd. v. Buess*, 855 N.E.2d 140, 153 (Ohio Ct. App. 2006).  Here, however, the Agreement does not use the word "rescission" and therefore the intent of the parties is not as clear.

For the following reasons, the Court concludes that the parties did not intend "termination" to mean "rescission."  First, in Section 7.3 the parties agreed that "the termination of the License or other rights granted to [Olivet] hereunder by [R.G. Barry] on any ground shall be without prejudice to any other rights or remedies which Licensor may have."  (Doc. 4 at § 7.3.)  This suggests that the parties contemplated that damages were not precluded if R.G. Barry terminated the License under Section 7.5.  Second, the Court is unconvinced by Olivet's argument that the reversion of the License to R.G. Barry and the royalty payments on sales

9

already made would constitute a rescission. Such remedies would not "restore their parties to their original positions as if the contract had never been formed." *Bell*, 944 N.E.2d at 1183. As R.G. Barry points out, taking the facts in the light most favorable to it as required on a motion to dismiss, R.G. Barry complied with its obligations under the Agreement not to seek an additional licensee. (Doc. 11 at 11.) Therefore, it "missed the opportunity to have its products sold and promoted appropriately during that time." (*Id.*) Similarly, Section 7.8 of the Agreement, which governs the disposal of inventory upon termination of the Agreement for any reason, suggests that the parties did not intend termination to be synonymous with rescission. This section provides for, among other things, options to R.G. Barry to purchase or request the destruction of inventory in Olivet's possession, and it sets out the prices to be paid and royalties due on such inventory. (Doc. 4. at § 7.8.) This provision is inconsistent with a rescission that would merely "restore the parties to their original positions as if the contract had never been formed." *Bell*, 944 N.E.2d at 1183. Therefore, the Court finds that the parties did not intend "termination" to constitute rescission, and that R.G. Barry terminated the Agreement.

2. *Money Damages Are Not Unavailable to R.G. Barry as a Matter of Law*

Olivet nevertheless urges the Court to find that no money damages are available to R.G. Barry as a matter of law because: (1) Section 7.6 spells out remedies that R.G. Barry would be entitled to receive upon termination of the Agreement (in particular, the payment of "all royalties on sales theretofore made" and Olivet's discontinuation of all use of the Licensed Trademarks); and (2) the liquidated damages provision of Section 7.7 applies only to termination rights under Section 7.4. (Doc. 9 at 7-8.) Therefore, contends Olivet, the plain terms of the Agreement do not allow for any other remedies to R.G. Barry in the event of a termination under Section 7.5. (*Id.*)

Section 7.7 provides for liquidated damages, at R.G. Barry's option, in the event of R.G. Barry's termination for certain specified material breaches under Section 7.4, in an amount "equal to the total of the Guaranteed Minimum Royalties that would have been payable by the Licensee to Licensor for the twelve (12) months following such termination had the Agreement remained in effect." (Doc. 4 at §7.7.) Olivet contends that because this section provides for liquidated damages only for termination under specific clauses of Section 7.4, the Court should interpret the Agreement to allow such damages *only* in the event of termination under those clauses, and not for termination under Section 7.5. R.G. Barry maintains, however, that Section 7.7 in itself demonstrates that "the remedy contemplated by the License Agreement upon termination for breach was not rescission, but damages." (Doc. 11 at 13.) Olivet points out that the problem with this argument is that the amount of liquidated damages specified in Section 7.7 is less than the amount that R.G. Barry is seeking. It would have been a curious choice for the parties, by specifying an amount of liquidated damages only for certain breaches, to intend that the non-breaching party receive a *larger* amount of liquidated damages for other breaches that were not mentioned. The Court is not persuaded that the liquidated damages clause of Section 7.7 supports R.G. Barry's argument that the Agreement "expressly provides for damages." (Doc. 11 at 12.)

Importantly, however, R.G. Barry's inability to collect liquidated damages under Section 7.7 does not preclude it from collecting *any* damages for breach of contract. First of all, other sections of the Agreement suggest as much. The liquidated damages provision, Section 7.7, allows "the right to receive, at [R.G. Barry's] option," certain specified liquidated damages. (Doc. 4. at § 7.7.) If the parties did not contemplate that other damages might be available to R.G. Barry upon termination under Section 7.4, they likely would not have included the phrase

11

"at [R.G. Barry's] option," because R.G. Barry would have no reason to elect the option of no damages over some damages. *See Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008) ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary."). Indeed, if the parties contemplated that other damages would be available in the event of a breach that led to termination under Section 7.4, there is no reason to believe that other damages might also be available for a breach that resulted in termination under Section 7.5. And as previously noted, Section 7.3 of the Agreement provides that termination of the License "shall be without prejudice to any other rights or remedies [R.G. Barry] might have." (Doc. 4 at § 7.3.) This section also suggests that the parties did not intend to preclude damages for breach of contract.

Secondly, although Olivet makes much of the fact that it would not make sense for R.G. Barry to receive a "windfall" of $4 million if the Agreement does not contemplate it even receiving 12 months' worth of royalties as liquidated damages, the Court finds this argument premature at this stage of the litigation. R.G. Barry insists that it is owed over $4 million in damages because during the duration of the Agreement, it fully complied with the Agreement and made no efforts to find another licensee when it learned that Olivet might seek to terminate the Agreement, thus missing the opportunity to have its products sold and promoted appropriately during that time. (Doc. 11 at 11.) Since discovery has not yet concluded and the parties are before the Court on a motion to dismiss, the Court will not speculate on what exactly R.G. Barry's expectation interest might be. R.G. Barry contends that it is entitled to the full amount of the Guaranteed Minimum Royalties and Advertising Obligation payments that would have been due over the course of the Renewal Term of the Agreement, namely, $4,137,500.00 plus interest. (*Id.* at 9.) But, of course, when the termination of the agreement became final

under Section 7.5, the License reverted from Olivet back to R.G. Barry. (*See* Doc. 4 at § 7.5.) Therefore, R.G. Barry was able to license its trademark to another company and to mitigate its damages. Because damages for injury to an expectation interest in a contract action "are limited to actual loss, the evidence must establish that loss with reasonable certainty." *Rasnick v. Tubbs*, 710 N.E. 750, 754 (Ohio Ct. App. 1998). Since the parties have not yet concluded discovery, the amount of damages to which R.G. Barry is entitled is not properly before the Court. But the Court concludes that R.G. Barry has, indeed, stated a claim for breach of contract based on Olivet's failure to comply with the Agreement. Defendants' Motion to Dismiss Plaintiff's breach-of-contract claim is **DENIED**.

### B. Breach of Covenant of Good Faith and Fair Dealing

Ohio law "imposes an implied duty of good faith on parties to any contract." *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009) (citing *Ed Schory & Sons, Inc. v. Francis*, 662 N.E.2d 1074, 1082-83 (Ohio 1996)). But a breach of the duty of good faith "cannot stand alone as a separate cause of action, independent of the underlying claim for breach." *Eggert Agency, Inc. v. NA Mgmt. Corp.*, No. 2:07-cv-1011, 2008 WL 3474148, at *3 (S.D. Ohio Aug. 12, 2008). Here, R.G. Barry has stated a viable claim for breach of contract, so the Court must decide if the good faith and fair dealing claim also survives.

The Ohio Supreme Court has explained that the implied covenant of good faith and fair dealing is implicated when a party takes "opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons*, 662 N.E.2d at 1082-83. R.G. Barry contends that Olivet breached the covenant of good faith and fair dealing when it took actions to cease its business and failed to exercise reasonable commercial effort to exploit R.G. Barry's trademarks. (Compl., Doc. 1 at ¶

13

58.) But the "implied duty of good faith cannot be breached by acting as allowed by the specific terms of the contract." *Wendy's Int'l*, 337 F. App'x at 477 (citing *Ed Schory & Sons*, 662 N.E.2d at 1083); *see also Florence Urgent Care v. Healthspan, Inc.*, 445 F. Supp. 2d 871, 879-80 (S.D. Ohio 2006) (declining to dismiss a claim for breach of good faith and fair dealing where the contract was allegedly terminated under false pretenses). Here, the parties specifically contemplated the possibility of Olivet ceasing its business and provided for immediate termination, at R.G. Barry's option, if Olivet did so. (*See* Trademark License Agreement, Doc. 4 at §7.4(j).). Because Olivet's actions were contemplated by the parties at the time of drafting, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's claim for breach of the duty of good faith and fair dealing.

### C. Intentional Misrepresentation

R.G. Barry alleges that Olivet committed fraud when it induced R.G. Barry to modify the terms of the License Agreement to extend the Agreement an additional three years in exchange for lowering the Guaranteed Minimum Sales and Guaranteed Minimum Royalty amounts that Olivet was required to pay. (Doc. 1 at ¶¶ 60-65.) Defendants argue that this claim must fail for three reasons: (1) under Ohio law, a claim for fraud cannot be predicated solely on breach of a contractual duty; (2) the damages that R.G. Barry seeks for its fraud claim are subsumed in the damages sought under the breach-of-contract claim; (3) the complaint does not satisfy the requirement of Federal Rule of Civil Procedure 9(b) that fraud be pleaded with particularity. (Doc. 9 at 10-13.) As to the first argument, R.G. Barry counters that Olivet induced it into entering into the Amendment to the Agreement by falsely representing that Olivet could produce the Guaranteed Minimum Royalties when Olivet knew it could not. R.G. Barry attempts to distinguish these facts from the allegations in its breach-of-contract claim that Olivet did not

make the payments or comply with other provisions under the Agreement. (Doc. 11 at 15.) According to Plaintiff, then, the two claims arise from separate factual allegations.

Defendants accurately characterize Ohio law, and Plaintiff's argument to the contrary is unavailing. Under Ohio law, "the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Thornton v. Cangialosi*, No. 2:09-CV-585, 2010 WL 2162905, at *2 (S.D. Ohio May 26, 2010) (citing *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981)). A tort claim "based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Infocision Mgmt. Corp., v. Foundation for Moral Law Inc.*, No. 5:08-CV-1412, 2009 WL 2244166, at *4 (N.D. Ohio July 27, 2009) (citation omitted). In other words, tort liability of parties to a contract "arises from the breach of some positive legal duty of good faith imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contractual obligation. *Wolfe*, 647 F.2d at 710. This rule ensures that "every breach of contract [does not] give rise to a tort." *Infociscion Mgmt.*, 2009 WL 2244166, at *4.

Here, Olivet's duties lay within the terms of the contract, and R.G. Barry has not pointed to any independent duty imposed by law that Olivet owed to it. *See id.* at *4-5. In *Infocision Management*, the court dismissed a claim for fraudulent inducement where a plaintiff attempted to distinguish its fraud and breach-of-contract claims with an argument that although "both initially arise from [the opposing party's] failure to abide by its agreement, the fraud claim was based on [opposing party's] intention not to perform the Agreement at the time it was entered into, while the breach of contract claim is based on [opposing party's] purported nonperformance

15

*regardless* of its intention at the outset or indeed at the time of the breach." *Id.* (emphasis in original). R.G. Barry's argument similarly fails. R.G. Barry cannot point to any "*collateral* misrepresentation designed to induce the plaintiff to enter into the contract" any more than the plaintiff in *Infocision Management*. *Thornton*, 2010 WL 2162905, at *3-4 (holding that, where a defendant had specifically warranted that he had sufficient assets to buy the plaintiffs' stock, the plaintiffs' allegations that the defendant "had no intention of keeping the promises at the time he made them is not enough to save the fraudulent inducement claim"). *See also Wall v. Planet Ford, Inc.*, 825 N.E.2d 686, 694 (Ohio Ct. App. 2005) (giving an example of a termite inspector's collateral misrepresentation of falsely representing that a house is infested with termites in order to induce the homeowner to enter into a pest control contract); *Creative Hardwood Floors, Inc. v. Schafer*, No. 97-CA-56, 1998 WL 515783, at *4 (Ohio Ct. App. Mar. 24, 1998) (dismissing fraudulent-inducement claim because it arose out of the same loan agreement as the breach-of-contract claim, and no independent duty existed).

Accordingly, even if the allegations here are sufficient to state a claim of fraudulent inducement under Rule 9(b), "[t]he representations that allegedly induced Plaintiff[ ] to enter into the [Agreement] are the same allegedly unfulfilled promises that give rise to the breach-of-contract claim." *Thornton*, 2010 WL 2162905, at *5. The Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's intentional misrepresentation claim.

### D. FTI's Liability Under the Guaranty

Defendant FTI signed a guaranty to R.G. Barry of "full, prompt, and complete payment when due of the payment obligations of the licensee hereunder," and agreed "to promptly pay such amounts as and when due in the event that Licensee fails to make such payments as and when required by this Agreement." (Doc. 4 at 37.) Because the Court denies the Motion to

Dismiss as to Count I, Plaintiff's claim for breach of contract, the Court also **DENIES** the Motion to Dismiss the claim against FTI for breach of its guaranty.

## IV. CONCLUSION

Defendants' Motion to Dismiss is **GRANTED** as to Counts II and III and **DENIED** as to Counts I and V[1].  Counts II and III of Plaintiff's Complaint are **DISMISSED**.

**IT IS SO ORDERED.**

                                             _s/ Algenon L. Marbley_
                                             **ALGENON L. MARBLEY**
                                             **UNITED STATES DISTRICT JUDGE**

**DATED:  January 5, 2016**

---

[1] R.G. Barry's complaint contains four counts but the fourth count, for breach of guaranty against FTI, is styled "Count V" due to what the Court assumes is a typographical error.  (Doc. 1 at 16.)