**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **R.G. BARRY CORPORATION,** | : | |
| | : | **Case No. 2:15-CV-826** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **OLIVET INTERNATIONAL, INC.,** | : | |
| **and FTI CORPORATION, LTD.,** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on Defendants' Olivet International, Inc. ("Olivet") and FTI Corporation, Ltd.'s (collectively, "Defendants") Motion for Summary Judgment (Doc. 49), and Defendants' Motion to Strike the Untimely Expert Rebuttal Report of Danny Simon (Doc. 54.) For the reasons that follow, the Court **DENIES** both motions.

## I.   MOTION FOR SUMMARY JUDGMENT

### A.  Background

#### 1. *The Trademark License Agreement and Amendment*

In July 2010, R.G. Barry and Olivet entered into a Trademark License Agreement (the "Agreement"), under which R.G. Barry licensed to Olivet the right to use certain DEARFOAMS-related trademarks on several types of apparel, including sleepwear. (*See* Trademark License Agreement, Doc. 4.)

The Agreement required Olivet to make certain minimum sales of licensed products in each year of the Agreement. (*Id.* at § 2.2.) Olivet was obligated to pay to R.G. Barry "Percentage Royalties" on a quarterly basis based on the net sales of the licensed products. (*Id.* at § 3.2.) Olivet was also required to pay R.G. Barry "Guaranteed Minimum Royalties" in each

year of the Agreement, in anticipation of circumstances where sales of the licensed goods did not meet the required minimums.  (*Id.* at § 3.4.)  Royalties were to be paid in four equal installments for each License Year, on January 31, April 30, July 31, and October 31.  (*Id.* at §§ 3.2, 3.4.)

The Agreement also contained multiple termination provisions.  R.G. Barry had the right to terminate the Agreement before the Initial Term (which ran from July 1, 2010 through December 31, 2015) expired, without condition, upon 90 days prior written notice to Olivet.  (*Id.* at § 7.1.)  Additionally, R.G. Barry had the right to terminate the Agreement under Section 7.4 for a number of specified material breaches by Olivet.  (*Id.* at § 7.4(a)–(t).)  Finally, R.G. Barry could terminate the Agreement under Section 7.5 "[i]n the event of the failure by [Olivet] to perform or observe any term or covenant or agreement contained in this Agreement, other than those specified in Section 7.4," provided that it give notice of the termination to Olivet.  (*Id.* at § 7.5.)  The termination would become effective automatically unless Olivet "completely cures the breach within thirty (30) days of the giving of the Notice of Termination."  (*Id.*)  Upon R.G. Barry's termination of the Agreement under Section 7.5, "all royalties on sales theretofore made" become "immediately due and payable," and the licensing rights in the DEARFOAM trademarks revert immediately back to R.G. Barry.  (*Id.* at § 7.6.)

Section 7.7 of the Agreement guarantees R.G. Barry's right to receive, at its option, liquidated damages "equal to the total of the Guaranteed Minimum Royalties that would have been payable by [Olivet] to [R.G. Barry] for the twelve (12) months following such termination had the Agreement remained in effect" if R.G. Barry terminates the Agreement for certain of the breaches specified in Section 7.4 of the Agreement.  (*Id.* at § 7.7.)

Additionally, Section 7.3 provides that "termination of the License or other rights granted to the [Olivet] hereunder by [R.G. Barry] on any ground shall be without prejudice to any other rights or remedies which Licensor may have." (*Id.* at § 7.3.)

Finally, the Agreement contains a survival clause, which states: "All of the terms and provisions of this Agreement intended to be observed and performed by the parties after the termination hereof, including but not limited to . . . obligations to pay the Guaranteed Minimum Royalties . . . shall survive the termination or expiration of this Agreement and continue thereafter in full force and effect." (*Id.* at § 10.8.)

The Agreement is governed by Ohio law and contains a forum selection clause requiring any legal action with respect to the Agreement to be brought in state or federal court in Ohio. (*Id.* at § 10.16.)

### 2. *Olivet's Purported Breaches and Internal Confusion*

During the first three years of the Agreement's term, while Olivet paid the Guaranteed Minimum Royalties, it was unable to make the Guaranteed Minimum Sales required under the Agreement. (Deposition of Jack Holodnicki ("Holodnicki Dep."), Doc. 58-2, at 103:3–5.) In November 2013, R.G. Barry agreed to lower the Guaranteed Minimum Sales and Royalties due in 2014 and 2015 in exchange for an extension of the Agreement through 2018. ("Amendment").

According to R.G. Barry, several months after the parties executed the Amendment and Olivet "reiterated its commitment to the DEARFOAMS brand," Olivet's "COO, part-owner, and ultimate decision-maker," Lydia Hsu, determined that Olivet should get out of the Agreement. (Pl.'s Mem. Opp'n to Mot. Summ. J., Doc. 58, at 5.) She instructed Olivet's president, Jack Holodnicki, to inform R.G. Barry of Olivet's decision. Holodnicki did so—calling R.G. Barry's CEO Greg Tunney on or around May 29, 2014. (*See* Holodnicki Dep. at 167:2–168:25, 172:16–

173:21, 169:17–24.)  Olivet followed up this phone call with a letter on June 17, 2014, stating that it planned to lay off its design staff and leave the apparel business, and requesting R.G. Barry's assent to the termination of the Agreement effective July 1, 2014.  (Declaration of Brad Newberg ("Newberg Decl."), Ex. T., Doc. 49-21.)  Olivet, by contrast, characterizes the June 17 letter as a request that R.G. Barry "consider" terminating the Agreement.  (Doc. 49 at 6.)  Yet Olivet terminated its designers and told its customers that it was exiting the apparel business before R.G. Barry responded to the June 17 letter.  (*See, e.g.*, Deposition of Peter Lin ("Lin Dep."), Doc. 58-6, at 160:4–161:13.)  And Olivet's corporate secretary, Peter Lin, e-mailed Tunney on June 30, 2014 confirming that Olivet had "terminated its entire apparel product development team" and was "in the process of winding down" its apparel business.  (Declaration of Nicole Kinsley ("Kinsley Decl."), Ex. H, Doc. 58-9.)  R.G. Barry responded to Olivet on July 3, 2014, reminding Olivet of its obligation to follow the Agreement through the recently-negotiated term and refusing to terminate the Agreement.  (*See* Newberg Decl. Ex. N, Doc. 49-15.)  Tunney attempted to contact Holodnicki throughout the summer of 2014, but received no response.  (Deposition of Greg Tunney ("Tunney Dep."), Doc. 58-5, at 108:13–110:24.)

The parties dispute the events that occurred in the months following R.G. Barry's response to the June 17 letter.  Olivet maintains that it "continued to operate and pay royalties under the license as required."  (Doc. 49 at 6.)  Olivet did make the required July 2014 Guaranteed Minimum Royalties payment, but R.G. Barry claims that it did not operate as required by the Agreement.  Specifically, R.G. Barry asserts that, by laying off designers, Olivet breached its requirements to use all commercially reasonable efforts to exploit the licensed trademarks and to maintain a dedicated designer.  (Expert Report of Danny Simon, Kinsley Decl. Ex. I, Doc. 58-10, at ¶¶ 64–73.)

Apparently, there was confusion even within Olivet about what was happening during the summer and fall of 2014. Hsu and Holodnicki disagree about whether she instructed him to get out of the Agreement with R.G. Barry, and Olivet's executives have inconsistent views about when the company made its decision to close its apparel business and inform its customers of the same. (*See* Holodnicki Dep. at 167:2–168:25, 172:5–173:21; Deposition of Lydia Hsu ("Hsu Dep."), Doc. 58-11, at 133:7–136:16; Lin Dep. at 143:22–144:4.) And Olivet's customers received news at the beginning of July 2014 that its Agreement with R.G. Barry was ending, but shortly thereafter, were informed that Olivet was staying in the business. (Holodnicki Dep. at 188:23–190:13; Lin Dep. at 171:20–172:2.) Holodnicki acknowledged that, during this time of confusion and "mixed messages," Olivet was "probably" not honoring all of its obligations under the Agreement. (*See* Holodnicki Dep. at 219:2–220:6.)

### 3. *Termination of the Agreement and Talks with Potential Licensees*

Olivet's "mixed messages" were not sent to R.G. Barry, however. According to R.G. Barry, Olivet made no attempt to revoke or change its June 2014 pronouncement that it was leaving the apparel business. Thus, R.G. Barry entertained offers from third parties interested in licensing the DEARFOAMS brand, who had heard from Olivet that the license would be available. (Deposition of Gary Sandefur ("Sandefur Dep."), Doc. 58-3, at 191:10–15.) R.G. Barry maintains that Olivet was "encouraging interested parties to initiate or continue these talks" behind the scenes. (Doc. 58 at 11.) After engaging in discussions with three potential licensees, R.G. Barry ended talks in October 2014, receiving offers where the "financial terms paled in comparison to what Olivet was paying," and realizing that it would not be able to have a new licensee in place for the 2015 season. (*Id.*)

On October 21, 2014, Lin wrote to R.G. Barry to request termination of the Agreement again, and also alleged that R.G. Barry had breached the Agreement's exclusivity provisions by

seeking new licensees. (Kinsley Decl. Ex. O, Doc. 58-16.) Although Olivet had not contacted R.G. Barry in four months, it claimed that it had "continued . . . honoring the Agreement's obligations." (*Id.*) R.G. Barry responded on October 30, 2014, giving Olivet "one final opportunity to confirm that Olivet intend[ed] to meet at least its obligation to pay at least the Guaranteed Minimum Royalties" through the term of the amended Agreement. (Kinsley Decl. Ex. Q, Doc. 58-18.) Olivet neither provided R.G. Barry with the requested confirmation nor made the quarterly royalty or advertising payments that were due on October 31, 2014. One week later, Olivet informed R.G. Barry by letter that it was withholding the October 31 royalty payment because R.G. Barry had engaged in discussions with third parties over terms for a new license. (Newberg Decl. Ex. O, Doc. 49-16.) Under Section 3.10 of the parties' Agreement, Olivet's obligation to pay royalties is "absolute, notwithstanding any claim [Olivet] may have or assert against [R.G. Barry]," and it has no right to "set-off" or "make any deduction from such royalty payments for any reason whatsoever." (Doc. 4, § 3.10.)

On November 20, 2014, R.G. Barry notified Olivet and FTI that Olivet was in breach of the Agreement and that R.G. Barry would terminate the Agreement under Section 7.5 if Olivet failed to cure its breach within 30 days. (Newberg Decl. Ex. P, Doc. 49-17.) Olivet did not make the payments and, therefore, on December 22, 2014, 30 days after R.G. Barry's breach notice, the termination of the Agreement became effective, which R.G. Barry also confirmed by letter on December 23, 2014. (Compl., Doc. 1, ¶¶ 46–47.)

On January 16, 2015, Olivet sent a check to R.G. Barry for $237,500, the amount of royalty payments and advertising payments that would have been due on October 31, 2014. (*Id.* ¶ 50.) According to R.G. Barry, however, this check was couched as a settlement offer rather

than a payment due under the Agreement.[1]  (Newberg Decl. Ex. R., Doc. 49-19.)  R.G. Barry did not cash Olivet's check.  (Sandefur Dep. at 241:21–242:4.)

#### 4. *The Dreamwear License*

In November 2014, a company called Dreamwear, Inc., reached out to R.G. Barry to express interest in the DEARFOAMS trademark.  The parties negotiated throughout almost all of 2015, and ultimately entered into a trademark license agreement.  (Newberg Decl. Ex. C, Doc. 49-4.)  The terms of this license agreement are not as financially favorable as the Olivet Agreement and Amendment.  (Doc. 58 at 15.)  As one example, Dreamwear is required to pay $150,000 in guaranteed minimum royalties over an 18-month period, whereas Olivet was obligated under the Agreement to pay $1,275,000 in guaranteed minimum royalties over that same period. (*Id.*)

The Dreamwear agreement does, however, contain termination provisions that are nearly identical to the Agreement.  (*Compare* Doc. 4 §§ 7.5, 7.6, 10.8 *with* Doc. 49-4 §§ 7.5, 7.6, 10.8.)  Importantly, however, Defendants note that R.G. Barry informed Dreamwear via e-mail during licensing agreement negotiations that the language in the parties' agreement would not entitle R.G. Barry to future royalties if it terminated the Dreamwear license.  (Newberg Decl. Ex. V, Doc. 49-23.)

#### 5. *Procedural History*

In March 2015, R.G. Barry filed a complaint alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional misrepresentation against Olivet, and breach of guaranty against FTI.  (Doc. 1 ¶¶ 52–71.)  Defendants filed a

---

[1] Before R.G. Barry filed the instant lawsuit, Olivet sued R.G. Barry in federal district court in California. According to R.G. Barry, this constituted yet another breach by Olivet, as it filed the California action in "willful disregard" of the Agreement's Ohio choice of venue clause.  (Doc. 58 at 14.)  Olivet ultimately voluntarily dismissed the California action.

motion to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Doc. 9.) The Court granted this motion in part, dismissing R.G. Barry's claims for breach of the implied covenant of good faith and fair dealing and intentional misrepresentation. (Doc. 19.) R.G. Barry's claim for breach of contract against Olivet, and breach of guaranty against FTI, remain. (*Id.*)

On February 13, 2017, Defendants moved for summary judgment on these claims. (Doc. 49.) This motion is fully briefed and is ripe for review. Defendants also moved, on February 24, 2017, to strike the rebuttal report of R.G. Barry's expert Danny Simon, which Defendants contend should have been disclosed as an affirmative report rather than a rebuttal report. (Doc. 54.) This motion, too, is fully briefed and ripe for adjudication.

## B. Standard of Review

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The movant may also meet this burden by pointing to the absence of evidence supporting one or more essential elements of the non-movant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d

577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party who has the burden of proof at trial must "make a showing sufficient to establish the existence of [each] element that is essential to that party's case." *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In evaluating such a motion, the Court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

Because diversity jurisdiction provides the basis for this Court's jurisdiction, and because R.G. Barry brings Ohio state-law claims, the Court assesses R.G Barry's substantive claims based on Ohio substantive law. *Coffey v. Foamex L.P.*, 2 F.3d 157, 160 (6th Cir. 1993).

### C. Genuine Issues of Material Fact Exist as to Whether R.G. Barry Is Entitled to Future Royalties under the Agreement.

To establish a breach of contract claim under Ohio law, a plaintiff must show that: (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from that failure. *Anzalaco v. Graber*, 970 N.E.2d 1143,

1148 (Ohio Ct. App. 2012). Olivet contests the elements of damages and performance by R.G. Barry. With regard to damages, Olivet argues that R.G. Barry's claim of entitlement to $4.1 million in post-termination "future" royalties is unsupported by the Agreement, and also fails because R.G. Barry's alleged damages were not proximately caused by Olivet's breach and have not been proved with reasonable certainty.[2] (*See* Doc. 49 at 2–4.) Olivet also claims that summary judgment is warranted because R.G. Barry was the first party to breach the Agreement. (*See id.* at 5.)

As a threshold matter, the Court must determine whether the parties' contract supports R.G. Barry's damages theory. When "confronted with an issue of contract interpretation, the Court's role is to give effect to the parties' intent." *Benzel v. Chesapeake Exploration, L.L.C.*, No. 2:13-CV-00280, 2014 WL 4915566, at *4 (S.D. Ohio Sept. 30, 2014) (Marbley, J.) (citation omitted). To do so, "courts are tasked to examine the contract as a whole and presume that the parties' intent is reflected in the contract's language." *Id.*; *see also Anzalaco*, 970 N.E.2d at 1148. A contract "is to be read as a whole and the intent of each part gathered from a consideration of the whole." *Saunders v. Mortensen*, 801 N.E.2d 452, 455 (Ohio 2004). The Court "must give effect to each provision of the contract" if doing so is reasonable. *Id.*

In addition, courts should "review the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent" from the agreement. *Benzel*, 2014 WL 4915566, at *4 (citation omitted). When a contract's written language is clear, a court may look only within the four corners of the writing itself to discern the parties' intent. *See id.* Courts

---

[2] R.G. Barry raised a claim for "brand damage" in Count II of its Complaint (which has been dismissed) and also mentioned this as a damages theory "tangentially during discovery." (Doc. 49 at 30 & n.41.) To the extent R.G. Barry intends to pursue such a claim, it is waived due to R.G. Barry's failure to address it in its brief opposing Defendants' motion for summary judgment. *See, e.g.*, *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (deeming claim abandoned where party failed to address it in response to summary judgment motion).

may "examine extrinsic evidence to determine the intent of the parties only if the contract is ambiguous." *Id.* (citing *Shifrin v. Forest City Enters.*, 597 N.E.2d 499, 501 (Ohio 1992)). A contract is ambiguous when it cannot be given a "definite legal meaning." *Id.* (citing *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). Put another way, ambiguity exists "only when a provision at issue is susceptible of more than one reasonable interpretation." *Id.* (citing *Lager v. Miller-Gonzales*, 896 N.E.2d 666, 669 (Ohio 2008)).

Defendants advance two primary arguments to support its position that R.G. Barry is not entitled to future royalties. First, Defendants assert that the Agreement is devoid of any provision that would obligate Olivet to pay royalties after R.G. Barry's termination of the Agreement. Defendants point specifically to the fact that a termination under Section 7.5 of the Agreement entitles R.G. Barry only to "all royalties on sales theretofore made," (Doc. 4, § 7.6), and the Agreement's lack of an acceleration clause "stating that all unpaid minimum royalties or other payments that would have become due over the term of the contract shall be accelerated and become 'immediately due and payable' upon termination." (Doc. 49 at 15.) According to Defendants' expert on industry standards, Michael Stevenson, acceleration clauses are common in apparel license agreements and are the product of the parties' negotiation. (Expert Report of Michael J. Stevenson ("Stevenson Report"), Newberg Decl. Ex. AA, Doc. 49-28, ¶¶ 1–3.) Thus, where an acceleration clause is absent, it is understood in the industry that the parties did not intend for the licensee to pay post-termination royalties.[3] (*See id.*) Further evidence of the parties' intent not to allow R.G. Barry's recovery of post-termination royalties, Defendants

---

[3] Defendants rely on out-of-Circuit case law to support their point that the Agreement does not provide for future royalties because it lacks a clear and unambiguous acceleration clause. (*See* Doc. 49 at 17–19 (collecting cases).) But all the case law makes clear is that acceleration clauses make the entirety of contract damages due and payable immediately. The impact of an acceleration clause is a question best left to the jury after it hears the testimony of the parties' respective expert witnesses.

argue, is Section 7.6's language accelerating *pre-termination* royalties, but not post-termination royalties. (*See* Doc. 49 at 19.)

Second, Defendants assert that R.G. Barry's damages claim conflicts with the liquidated damages clause of the Agreement. Under Defendants' interpretation of the Agreement, the only time "a possible acceleration of post-termination royalties" is referenced is in Section 7.7, the liquidated damages provision. (Doc. 49 at 21.) As set forth above, Section 7.7 of the Agreement guarantees R.G. Barry's right to receive, at its option, liquidated damages "equal to the total of the Guaranteed Minimum Royalties that would have been payable by [Olivet] to [R.G. Barry] for the twelve (12) months following such termination had the Agreement remained in effect" if R.G. Barry terminates the Agreement for one of the "egregious" breaches specified in Section 7.4 of the Agreement. (Doc. 4 at § 7.7; Doc. 49 at 21.) That is, "Section 7.7 established that future guaranteed minimum royalties could only be recovered under specific circumstances." (Doc. 49 at 21.)

According to Defendants, the only purported breach at issue in this case is the "minor breach" of a missed royalty payment—a breach not included in Section 7.4 and therefore one that does not trigger the liquidated damages clause. (*Id.*) Thus, it would be "manifestly absurd" for a breach that does not even trigger a year's worth of royalties under Section 7.7 to entitle R.G. Barry to four times the amount of liquidated damages set by the parties. (*Id.*) In addition, Defendants claim that "by including this liquidated damages provision, the parties made clear that the acceleration of future royalty payments was permitted under the Agreement—in the form of liquidated damages—***only in the event*** Olivet committed one of the listed material breaches under Section 7.4, and not under any other circumstances." (*Id.* at 21–22 (emphasis in original).)

To interpret the Agreement any other way would be to read out the parties' specifically negotiated liquidated damages clause.

R.G. Barry points out that the liquidated damages clause is not exclusive; it is limited to "certain enumerated breaches," and even for those breaches, it allows R.G. Barry to determine whether to accept liquidated damages or to pursue its actual damages. (Doc. 58 at 26–27.) As for Defendants' argument that liquidated damages are available for only the most significant breaches, R.G. Barry notes that the purpose of liquidated damages is to "settle in advance what damages would be due in the event of a breach for which it would be impossible, or difficult and expensive to quantify the harm," *not* to punish particularly egregious breaches. (*Id.* at 27.) Finally, there are "a host of very serious breaches" for which liquidated damages are not available—including "shutting down the business, refusing to continue performing under the Agreement, and repudiating all future payment obligations." (*Id.* at 28–29.) According to R.G. Barry, this means that damages in excess of liquidated damages are appropriate, because it would be illogical to allow R.G. Barry liquidated damages if Olivet underpays royalties, but would get no damages if Olivet refuses to pay *any* royalties. (*See id.* at 29.)

The parties also disagree about the import of the Agreement's survival clause, which states that "All of the terms and provisions of this Agreement intended to be observed and performed by the parties after the termination hereof, including but not limited to . . . obligations to pay the Guaranteed Minimum Royalties, Percentage Royalties . . . shall survive the termination or expiration of this Agreement and continue thereafter in full force and effect." (Doc. 4 at § 10.8.) Defendants maintain that this "boilerplate" language "simply makes clear that the Agreement's termination did not relieve Olivet of its obligation to remit any unpaid royalties or other payments that had accrued prior to the termination date." (Doc. 49 at 24–25.) The

survival clause makes no mention of future royalties, nor does it contain the word "breach." Thus, according to Defendants, interpreting the survival clause to allow future royalties would render Olivet's alleged breach "entirely irrelevant" and give R.G. Barry the right to terminate the Agreement at its sole discretion (which is permitted under Section 7.1) and allow it to "send notices of termination to its licensees the day after signing a license and then demand all minimum royalties for the length of the original contract." (*Id.* at 25.)

Additionally, Defendants' expert posits that the "known industry standard" of "relieving a licensee of the obligation to pay post-termination royalties comports with the realities of the apparel business." (*Id.* at 16; *see also* Stevenson Report ¶ 2.) The royalties in apparel license agreements are typically "calculated as a percentage of sales revenue"; the royalty structure "presupposes the licensee's continued sale of the licensed goods." (Doc. 49 at 16.) Stevenson opines that the reason the standard is to relieve the licensee of the obligation to pay post-termination royalties is because it would be "inequitable" for a licensor to terminate a licensing agreement—which precludes the licensee from selling the licensed goods—while simultaneously receiving future royalty payments that "the parties intended would have come from sales of the licensed goods that the licensee is now unable to make." (*Id.* (citing Stevenson Report ¶ 2))

R.G. Barry, by contrast, asserts that the survival clause shows that the parties "clearly contemplated what would happen with respect to the Guaranteed Minimum Royalties in the event of termination of the Agreement": they agreed that Olivet's obligation to pay such royalties would survive termination. (Doc. 58 at 22–23.) According to R.G. Barry, this intent is evidenced by the plain language of the clause stating that the obligation to "pay the Guaranteed Minimum Royalties . . . shall survive the termination or expiration of this Agreement and continue thereafter in full force and effect." (Doc. 4 at § 10.8.) While R.G. Barry concedes that

Stevenson's opinion that the survival clause is "only meant to clarify that the payment of already-accrued but not-yet-due royalties is still required" would make sense in the context of paying post-termination percentage royalties, which are tied directly to sales, it argues that this view is illogical with regard to guaranteed minimum royalties—which are due irrespective of the number of sales a licensor makes. (*See* Doc. 58 at 24–26.) Additionally, because guaranteed minimum royalties come due in advance of each quarter, "at the time of any termination, the Guaranteed Minimum Royalties for the current quarter would already have been paid, so there would be no need for the Survival Clause to address them." (*Id.* at 24.) That is, "if Olivet's interpretation is correct, when the Agreement terminated on December 22, 2014, it should have no obligation to make the October 31 payment, since that payment was for 2015." (*Id.*) R.G. Barry notes that this reading of the survival clause would render it meaningless or surplusage. (*Id.*)

In their briefs and at oral argument, the parties were careful to take the position that the Agreement was unambiguous with regard to their respective positions on the availability of post-termination future royalties. The Court disagrees that the question of the validity of R.G. Barry's damages theory is a matter of interpreting an unambiguous contract. Here, to discern the parties' intent, as it must, *see Benzel*, 2014 WL 4915566, at *4, the Court must look beyond the four corners of the Agreement because each of the "provision[s] at issue [is] susceptible of more than one reasonable interpretation." *Id.* (citing *Lager*, 896 N.E.2d at 669). The Court finds that *both* parties' articulations of their individual positions about each of the Agreement's disputed provisions—discussed in detail above—are reasonable and not contrary to law. For example, while Defendants make much of the "absurd[ity]" of permitting $4.1 million in damages for a breach that does not even trigger one year's worth of royalties under the Agreement's liquidated

damages clause, R.G. Barry's interpretation does not "read out" the clause. It is not for the Court to comment on the wisdom of the contractual terms that the parties agreed to, so long as the contract is not illegal and all terms are given effect.

Because the terms of the Agreement are ambiguous,[4] extrinsic evidence can be examined to discern the parties' intent. *Benzel*, 2014 WL 4915566, at *4. Defendants argue that, even if the Court examines this evidence after finding the Agreement ambiguous, there is still no genuine issue of material fact as to R.G. Barry's lack of entitlement of post-termination future royalties, because: (1) R.G. Barry's interpretation of the nearly-identical Dreamwear license does not allow for future royalties; and (2) none of R.G. Barry's witnesses could pinpoint a provision of the Agreement that supports its damages theory. Like the terms of the Agreement itself, however, this extrinsic evidence is susceptible of more than one reasonable interpretation. While Defendants claim that a "smoking gun" e-mail from R.G. Barry to Dreamwear reveals that R.G. Barry interprets the nearly-identical Dreamwear license as not allowing for the recovery of future royalties and that R.G. Barry reassured Dreamwear of the same (*see* Doc. 49 at 22–23), R.G. Barry contends that this e-mail pertains only to a very narrow situation: a termination of the license for R.G. Barry's convenience. (*See* Doc. 58 at 36–37.) And while Defendants claim that none of R.G. Barry's witnesses could find a provision in the Agreement that supports its damages theory, at oral argument, R.G. Barry's counsel stated that, to the contrary, all of R.G. Barry's witnesses testified that they believed R.G. Barry was entitled to the "full measure of its damages."

---

[4] Olivet's argument that ambiguous contract terms should be construed against R.G. Barry as the "primary drafter" of the Agreement is without merit. (Doc. 49 at 20.) The Agreement at issue here is the product of arm's length negotiations between two sophisticated business entities. The *contra proferentem* canon typically applies only in cases involving "parties of unequal bargaining power." *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 847 (6th Cir. 2013) (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 764 (6th Cir. 2008)).

In light of the ambiguities in both the Agreement itself and the extrinsic evidence, the Court finds that genuine issues of material fact exist as to whether R.G. Barry is entitled to post-termination royalties as damages under the parties' Agreement that preclude summary judgment. A jury, after hearing testimony from the parties' expert witnesses and considering the terms of the Agreement and relevant extrinsic evidence, will be in a better position to discern the parties' intent.

The Court, finding that a genuine issue of material fact exists with regard to the threshold question of whether R.G. Barry is entitled to future royalties as damages under the Agreement, declines to address the parties' remaining arguments in detail, but finds that additional questions of fact exist, including but not limited to: (1) the nature of Olivet's purported breach of the Agreement; (2) the damages R.G. Barry suffered as a result of Olivet's breach; (3) the proximate cause of R.G. Barry's alleged damages; (4) R.G. Barry's performance of its contractual obligations; and (5) R.G. Barry's mitigation of its alleged damages. Accordingly, Defendants' motion for summary judgment is **DENIED**.[5]

## II.    MOTION TO STRIKE DANNY SIMON'S EXPERT REBUTTAL REPORT

### A.  Factual and Procedural Background

In November 2016, this Court issued a Scheduling Order setting the following expert witness disclosure-related deadlines:

- **December 16, 2016:** deadline to identify expert witnesses, which includes the disclosure of the expert's identity and a brief description of the subject matter of the expert's opinions;

- **January 13, 2017:** deadline for full expert reports; and

- **February 13, 2017:** deadline for rebuttal expert reports.

---

[5] Because R.G. Barry's breach of contract claim against Olivet survives summary judgment, so too does its breach of guaranty claim against FTI.

(Doc. 42.)  The parties timely identified their respective expert witnesses on December 16, 2016. In its disclosure, R.G. Barry identified Danny Simon as its expert on "issues relating to industry standards, practices, and expectations for apparel licenses, including industry standards and practices relevant to the success of a licensee, industry expectations for the conduct of a licensor; industry standards and practices regarding the exit from or termination of a license agreement; and the application of those standards, expectations and/or practices to the conduct of Olivet and R.G. Barry at issue in this case."  (Ex. D to the Declaration of Scott Stitt ("Stitt Decl."), Doc. 54-5.)  R.G. Barry also reserved its right to call rebuttal expert witnesses in response to evidence or expert testimony Defendants sought to introduce at trial.  (*Id.*)

R.G. Barry served Defendants with Simon's affirmative expert report by the January 13, 2017 deadline.  (*See* Stitt Decl., Ex. F (the "Simon Report"), Doc. 54-7.)  According to Defendants, the Simon Report was "true to R.G. Barry's December 16 expert witness disclosure" in that it focused on "industry standards, practices, and expectations concerning the parties' *conduct*" and was "completely silent on industry standards for interpreting contract *terms* in apparel licensing agreements, including terms related to whether a licensee is obligated to pay 'future' royalties such as an acceleration or liquidated damages clause."  (Doc. 54 at 5 (emphasis added).)  But R.G. Barry points to several portions of the Simon Report that pertain to industry standards.  For example, Simon's opinion is that "the terms and conditions of each licensing agreement are unique to the deal in question," and thus the terms of a license agreement are typically established through negotiation rather than industry standard.  (Simon Report ¶ 22.) Additionally, according to R.G. Barry, several sections of the Simon Report support its expectation that it would receive post-termination royalties.  (*See id.* ¶¶ 76, 78–89.)

Defendants emphasize that, unlike R.G. Barry's disclosure that Simon would opine on industry standards, practices, and expectations regarding the *conduct* of parties to a licensing agreement, in its expert disclosure, it expressly stated that its expert, Michael J. Stevenson, would opine on "apparel and licensing agreements, including but not limited to industry standards, *the interpretation of apparel licensing agreements*, and *the terms of the License Agreement* with respect to liability or damages in this case." (Stitt Decl., Ex. E, Doc. 54-6 (emphasis added).) In his report, Stevenson sets forth the industry standards for interpreting contract terms in apparel licensing agreements, and then applies those standards to the terms of the parties' Agreement. (Stitt Decl., Ex. G ("Stevenson Report"), Doc. 54-8, ¶¶ 1–17.) Stevenson's essential conclusion is that R.G. Barry's claim for $4.1 million in future royalties is baseless given the absence of an acceleration clause in the Agreement and the language of the liquidated damages clause. (*See id.* ¶¶ 7–17.)

Defendants filed their Motion for Summary Judgment on February 13, 2017, the date of the rebuttal expert deadline and nearly six weeks before the dispositive motion deadline. (*See* Doc. 42.) In that motion, Defendants repeatedly reference "R.G. Barry's failure to submit any affirmative expert opinion evidence on the issue of damages by the January 13 deadline for affirmative expert witness reports." (Doc. 54 at 7.) In addition, the Motion for Summary Judgment contains Defendants' theory that a "licensee is relieved of the obligation to pay royalties apart from those that were already owed prior to the termination date absent a specific and unambiguous acceleration clause—a theory that R.G. Barry maintains was not revealed by Defendants until it was set forth in the Stevenson Report. (*See* Doc. 57 at 6.)

Accordingly, R.G. Barry argues, it served Defendants with Simon's rebuttal expert report (the "Simon Rebuttal Report") on the February 13 deadline, so that Simon could rebut the novel

acceleration clause theory contained in the Stevenson Report. (*See id.* at 8; *see also* Stitt Decl., Ex. H, ¶¶ 4–5, 12–14.) But Defendants assert that the Simon Rebuttal Report actually "contain[s] newly disclosed opinions from Mr. Simon concerning alleged industry standards for interpreting contract terms in apparel licensing agreements," and therefore represents an "untimely affirmative expert disclosure relating to R.G. Barry's damages claim on a topic for which Mr. Simon was not disclosed as an expert." (Doc. 54 at 7.) R.G. Barry "did not update its December 16 expert witness disclosure to designate Mr. Simon on any additional topics of testimony." (Stitt Decl. ¶ 13.)

Defendants therefore move to strike the Simon Rebuttal Report on the grounds that it: "(i) represents an untimely affirmative expert disclosure on a topic for which [Simon] was not disclosed as an expert by [R.G. Barry]; and (ii) is outside the scope of an authorized rebuttal report." (Doc. 54 at 1.)

### B. Standard of Review

Defendants move to strike the Simon Rebuttal Report under Rules 26(a) and 37(c)(1) of the Federal Rules of Civil Procedure. Rule 26(a)(2)(D) obligates parties to make expert witness disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). If a party fails to provide expert witness information required by Rule 26(a) or (e), that party may not use that information in a motion or at trial, "unless the failure was substantially justified or harmless." *Id.* 37(c)(1). "[D]espite the mandatory language of the rule, the appellate courts continue to insist that exclusion pursuant to Rule 37(c)(1) falls within the sound discretion of the trial court." *Gonzalez Prod. Sys., Inc. v. Martinrea Int'l, Inc.*, No. 13-cv-115544, 2015 WL 348710, at *4 (E.D. Mich. Jan. 26, 2015) (citation omitted).

## C. Analysis

1. *Simon Was Properly Designated as an Expert on Industry Standards for Interpreting Contract Terms in Apparel Licensing Agreements.*

According to Defendants, the Simon Rebuttal Report should be stricken because R.G. Barry never designated Simon as an expert on the topic it covers—"industry standards for interpreting contract terms in apparel licensing agreements"—in violation of Rule 26. (Doc. 54 at 8.) Defendants argue that R.G. Barry's identification of Simon's proffered expert testimony on December 16, 2016, focused solely on industry standards as they pertained to the "conduct" of the parties and was "devoid of any reference to industry standards for interpreting contract terms in apparel licensing agreements." (*Id.*) Because R.G. Barry never supplemented this initial disclosure, and because the Simon Report does not discuss industry standards for interpreting contract terms, Defendants claim that they learned Simon would be opining on this topic for this first time in the Simon Rebuttal Report.

As set forth above, in its December 16, 2016 disclosure, R.G. Barry identified Simon as its expert on "***issues relating to industry standards, practices, and expectations for apparel licenses, including*** industry standards and practices relevant to the success of a licensee, industry expectations for the conduct of a licensor; ***industry standards and practices regarding the exit from or termination of a license agreement***; and the application of those standards, expectations and/or practices to the conduct of Olivet and R.G. Barry at issue in this case." (Stitt Decl., Ex. D (emphasis added).) Based on this broad description, the Court finds that R.G. Barry intended to designate Simon as its industry standards expert and that the interpretation of apparel licensing agreement terms is a topic that falls under the umbrella of "issues relating to industry standards, practices, and expectations for apparel licenses." The Court agrees with R.G. Barry that Defendants' argument "seems to rely on an assumption that R.G. Barry could *only* serve a

rebuttal report if it used the *exact same language* in its Expert Identification as Olivet did in its own," and that there is no authority to support Defendants' overly technical, "form-over-substance assertion." (Doc. 57 at 10 (emphasis in original).)

Further, the Simon Report does not focus only on the parties' conduct, as Defendants claim. Section IV of the Simon Report details the "Elements of a Successful Licensing Agreement," and opines that it is industry standard to negotiate the terms of each licensing agreement individually, depending on the contours of the specific deal. (*See* Simon Report, Sect. IV; ¶ 22.) And in his initial report, Simon also opines on whether it would be reasonable under industry standards for R.G. Barry to terminate the Agreement and then pursue post-termination royalties. (*See id.* ¶¶ 85–89.)

Because the language of R.G. Barry's expert witness disclosure encompasses the topic covered by the Simon Rebuttal Report, and the opening Simon Report goes beyond addressing the conduct of the parties, Simon was properly designated as an expert on industry standards for interpreting contract terms in apparel licensing agreements under Rule 26.

### 2. *Simon's Rebuttal Opinions Are Timely.*

Defendants also move to strike the Simon Rebuttal Report as an "untimely affirmative expert disclosure containing new opinions bearing on R.G. Barry's damages claim that should have been offered in Mr. Simon's January 13 opening expert report." (Doc. 54 at 9.) Where a plaintiff knows that the defendant "means to contest an issue that is germane to the prima facie case," the plaintiff "must put in his evidence on the issue as part of his case in chief . . . . Otherwise the plaintiff could reverse the order of proof, in effect requiring the defendants to put in their evidence before the plaintiff could put in his." *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th Cir. 1996) (internal citation omitted). Thus, because it is undisputed that

R.G. Barry bears the burden of proof on the issue of whether it is entitled to future royalties as damages under the Agreement, Defendants argue that R.G. Barry was required to present Simon's opinions on industry standards in the initial Simon Report.

As set forth above, however, in his initial report, Simon *did* touch on the reasonableness of R.G. Barry's belief that it was entitled to post-termination royalties as damages—albeit briefly. (*See* Simon Report ¶¶ 85–89.) And given that Defendants did not raise their theory about the lack of an acceleration clause in the Agreement until the Stevenson Report, it would have been impossible for Simon to respond to this at an earlier juncture. Also, in light of the fact that R.G. Barry's position is that the "presence or absence of an acceleration clause in the License Agreement" is irrelevant to the question of whether R.G. Barry is entitled to its Minimum Guaranteed Royalties, it stands to reason that Simon would not have opined on acceleration clauses in his opening report. (*See* Doc. 57 at 11.)

For all of these reasons, the Simon Rebuttal Report is not an "affirmative" expert disclosure, nor is it untimely, as it was served on the rebuttal deadline of February 13, 2017. Because R.G. Barry did not run afoul of Rule 26, the Simon Rebuttal Report is not subject to preclusion under Rule 37(c)(1) and the Court need not conduct a sanctions analysis.

### 3. *Section IV Is Proper Rebuttal Testimony.*

Finally, Defendants move to strike Section IV of the Simon Rebuttal Report in its entirety. Under Rule 26(a)(2)(D)(ii), a rebuttal expert report is one that "solely contradict[s] or rebut[s] evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). In Section IV of his rebuttal report, Simon delineates the ways in which Olivet's conduct fell short of industry standards to support his opinion that R.G. Barry's expectation of future royalties was reasonable. (Simon Rebuttal Report, Sect. IV.) Again, Defendants claim

that the Stevenson Report focuses solely on industry standards governing the interpretation of *terms* in apparel licensing agreements, not industry standards governing the parties' *conduct*, and thus Section IV "necessarily does not 'contradict or rebut' Mr. Stevenson's opinions" must be stricken as beyond the scope of a proper expert rebuttal report.  (Doc. 54 at 15.)

For the reasons previously discussed, the Court finds meritless the Defendants' arguments premised on the false distinction between industry standards relating to contract terms and industry standards regarding performance of a contract.  Moreover, by setting forth Olivet's alleged breaches and opining that R.G. Barry's expectation of future royalties is reasonable in light of those purported breaches in Section IV of his rebuttal report, Simon is contradicting Stevenson's opinion that a licensee is relieved of the obligation to pay future royalties when a licensor terminates a license agreement irrespective of whether or not the licensee has breached that agreement.  (*See* Stevenson Report ¶ 1; *see also id.* ¶ 7.)  Accordingly, Section IV is proper rebuttal testimony and is not precluded.

### III.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment and Motion to Strike the Untimely Expert Rebuttal Report of Danny Simon are **DENIED**.

**IT IS SO ORDERED.**

___s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  September 29, 2017**